IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CLINTON GARRISON,

       Plaintiff,

vs.                                No. 05cv602 MCA/RHS

VILLAGE OF RUIDOSO et al.,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendants' Third Motion for Summary Judgment* [Doc. 51], filed May 18, 2006.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion in part and denies the motion in part.

## I. BACKGROUND

The following facts are taken from the *Complaint* or are otherwise undisputed by the parties and thus are accepted as true for purposes of Defendants' motion for summary judgment.

On the evening of May 28, 2002, Plaintiff Clinton Garrison ("Clinton"), then 16 years old, was riding his motorcycle within the limits of the Village of Ruidoso, New Mexico, when Defendant and former Village of Ruidoso police officer Alfred Clyde Stinnett, having determined that Clinton was speeding and driving recklessly, effected a traffic stop.

According to Clinton, Officer Stinnett patted him down immediately upon detaining him, finding nothing but a spark plug in one of Clinton's jacket pockets.  Officer Stinnett then wrote Clinton two citations, one for speeding and one for reckless driving, and presented them to Clinton for his signature.  Clinton did not sign the citations at that time, explaining to Officer Stinnett that he wished to await the arrival of his parents, Steve and Connie Garrison ("Steve and Connie"), before doing so.  Clinton knew that Officer Stinnett had called Steve and Connie and that they were en route from their home, which was approximately one and one-half miles from the site of the traffic stop.  When Clinton did not sign the citations, Officer Stinnett made the decision to arrest him.  According to Clinton, Officer Stinnett then slammed Clinton with excessive force against the hood of his patrol car and handcuffed him tightly.  At about this time, Village of Ruidoso police officer Corky Condon and Steve and Connie had arrived or were arriving at the scene.  Officer Stinnett then transported Clinton to the police station, where Clinton says he was questioned and searched but never advised of his <u>Miranda</u>[1] rights.  Steve and Connie retrieved Clinton from the police station later that night.

On May 31, 2005, Clinton filed his *Complaint to Recover Damages and Injunctive Relief Resulting from Police Misconduct Under 42 U.S.C. Sec. 1983* against Officers Stinnett and Condon; the Village of Ruidoso; Village Councilmembers Ronald Hardeman, Frank T. Cummins, Lonnie Ray Nunley, Robert Sterchi, Deborah Marcum-Byars, and Ron Anderson;

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

former Village of Ruidoso Police Department Lieutenant Wolfgang Born; and former Village of Ruidoso Chief of Police Lanny Maddox.[2]   The *Complaint* asserts various state-law and constitutional claims against the police defendants, as well as claims that the Village and Councilmembers were responsible for the creation of a policy or custom that caused a constitutional deprivation.  [See generally Doc. 1].  On May 18, 2006, Defendants filed their motion for summary judgment.  [Doc. 52].

## II. ANALYSIS

### A. History of the Proceedings and the Claims Currently Before this Court

As an initial matter, the Court notes that the *Complaint* in this matter was filed by Steve, *pro se*, and named himself, Connie, and Clinton as Plaintiffs in the action.  Because Steve is not an attorney, the Court held a telephonic status conference on January 17, 2006, to determine whether Steve could properly represent another party (or parties) in this Court.[3]  [See Doc. 32; Clerk's Minutes of Jan. 17, 2006].  Thereafter, on January 23, 2006, attorney J. Robert Beauvais entered an appearance for the Garrisons.  [See Doc. 33].  Counsel never moved to amend Steve's original *Complaint*, which therefore remains the operative *Complaint* in this matter and alleges that Defendants violated Clinton's rights to be free from the following:

_____

[2]  Wolfgang Born is currently the Chief of Police for the Village of Ruidoso Police Department and Lanny Maddox is no longer with the Department.  For purposes of this *Opinion*, however, Born is referred to as "Lieutenant Born" and Maddox as "Chief Maddox."

[3]  See 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct *their own* cases personally . . . .") (emphasis added).

(1) unreasonable search and seizure;
(2) warrantless search and seizure;
(3) search and seizure without probable cause;
(4) the use of excessive force;
(5) assault and battery;
(6) the intentional infliction of emotional distress:
(7) negligent performance of police duties;
(8) summary punishment without trial;
(9) malicious prosecution;
(10) false imprisonment;
(11) the consequences of inadequate police training;
(12) false arrest;
(13) the denial of due process of law;
(14) the denial of counsel;
(15) search, seizure, and questioning in the absence of parental supervision; and
(16) false accusations of an accuser.

[See Doc. 1 at 10-11].

On February 6, 2006, Defendants moved for summary judgment on the Garrisons' state-law claims, which Defendants specified in their motion's "Statement of Undisputed Facts" as those alleging  (1) assault and battery; (2) intentional infliction of emotional distress; (3) malicious prosecution; (4) false imprisonment; and (5) false arrest.  [Doc. 37 at 3].  On February 7, 2006, Defendants moved for summary judgment on the civil-rights claims of Steve and Connie.  [See Doc. 38].  Although the parties agreed to extend the deadline for responses to these summary-judgment motions until March 8, 2006, no response to either motion appears to have been filed.  [See docket in case no. 05cv602].  By Order entered March 31, 2006, this Court dismissed all Plaintiffs' state-law claims and the civil-rights claims of Steve and Connie.  The Court also dismissed Steve and Connie as parties to the action.  [See Doc. 47].  The Court's Order thus left Clinton as the sole remaining

4

Plaintiff who, through counsel, later conceded to summary judgment with respect to his claims for the violation of his rights to be free from (1) the negligent performance of police duties; (2) summary punishment without trial; and (3) false accusations of an accuser.[4] [See Doc. 53 at 8-9, 14]. Thus, in light of the terms of the Court's March 31, 2006, *Order* and Clinton's later concession, the Court takes this opportunity to clarify that Clinton is now the sole Plaintiff in this action and the remaining claims are those asserting violations of his rights under the Fourth (search and seizure) and Sixth (right to counsel) Amendments,[5] as well as his right to be free from the use of excessive force and the consequences of a policy or custom resulting in the deprivation of constitutional rights.[6]

_____

[4] Clinton also conceded to summary judgment on his claim for intentional infliction of emotional distress. [See Doc. 53 at 8-9]. The Court determines, however, that this claim was previously dismissed by the terms of its March 31, 2006 *Order*. [See Doc. 47].

[5] See Doc. 1 at 11 ("All of the rights a-p [listed as (1)-(16) in this *Opinion*] are secured to the plaintiff by the provisions of the Fourth and Fourteenth (and as to denial of counsel the Sixth and Fourteenth) Amendments to the Constitution of the United States of America . . . .").

[6] Clinton has also alleged a violation of his right to due process as secured by the Fourteenth Amendment. While he has not identified the precise Fourteenth Amendment right that was allegedly infringed, Clinton appears to tie this claim to the allegation that he was the victim of malicious prosecution. [See Doc. 1 at 8 ("[T]he citations for speeding and reckless driving . . . were done intentionally without probable cause . . . and was malicious prosecution that was eventually resolved in Plaintiff's favor and a violation of due process United States Constitution 6th and 14th Amendments . . . .")]. Accordingly, the Court construes this claim as one for deprivation of substantive due process under the Fourteenth Amendment. See Albright v. Oliver, 510 U.S. 266, 269 (1994) (where petitioner alleged that respondent had deprived him of substantive due process under the Fourteenth Amendment—his "liberty interest"—to be free from criminal prosecution except upon probable cause). However, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Id. at 273 (internal quotations omitted). Accordingly, this Court will analyze Clinton's due process claim under Fourth and Sixth Amendment frameworks only. See id. at 271 (holding that it was the Fourth Amendment, and not

**B. Standard of Review**

**1. Summary Judgment**

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the

---

substantive due process, under which petitioner's claim was required to have been judged).

moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### 2. Qualified Immunity

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish, first, that the defendant violated a constitutional right.  Cortez v. McCauley, 438 F.3d 980, 988 (10th Cir. 2006) (citing Reynolds v. Powell, 370 F.3d 1028, 1030 (10th Cir.2004)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, however, a violation has been shown, the next step in the qualified-immunity sequence is to ask whether the constitutional right was clearly established when the alleged conduct occurred.  See Cortez, 438 F.3d at 988.

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation."  Saucier, 533 U.S. at 202.  For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as the plaintiff maintains.  Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002).  Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct was clearly unlawful.  Saucier, 533 U.S. at 202.  If, however, the plaintiff successfully establishes both a violation of a

constitutional right and that the right was clearly established at the time of the alleged conduct, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law. Cortez, 438 F.3d at 988 (*citing* Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir.2002)). "In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense." Olsen, 312 F.3d at 1312.

### C. Claims Against Officers Stinnett and Condon

Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Section 1983 is not an independent source of substantive rights; rather it is a mechanism for enforcing federal rights conferred elsewhere. See Albright, 510 U.S. at 271. Accordingly, an analysis of a plaintiff's federal civil-rights claim necessarily begins by identifying the specific constitutional right or rights allegedly infringed. Graham v. Connor, 490 U.S. 386, 393-94 (1989).

### 1. The Fourth Amendment

#### a. The initial traffic stop

8

In this case, Clinton appears[7] to allege that his Fourth Amendment rights were violated when Officer Stinnett stopped him without cause, searched him, and made a warrantless arrest based on Clinton's failure immediately to sign the citations for speeding and reckless driving.  Clinton also contends that Officer Stinnett applied excessive force by slamming Clinton's head into the hood of his police car after Clinton asked if he could wait to sign the citations until his parents arrived.  [See Doc. 1 at 7; Doc. 53 at 14-15].  That allegation is considered in conjunction with Clinton's Fourth Amendment claims.  See Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001) ("Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment.").

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A traffic stop is a "seizure" within the meaning of the Fourth Amendment.  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).  A routine traffic stop, however, is more analogous to an investigative detention than a custodial arrest, which is why such stops are analyzed under the principles developed for investigative detentions set forth in Terry v. Ohio. Id.  To determine the reasonableness of an investigative detention, the Court makes a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the

_____

[7]  Because Clinton's *Complaint* was filed *pro se*, the Court liberally construes the allegations contained therein.  See Garcia v. Lemaster, 439 F.3d 1215, 1217 (10th Cir. 2006) (*citing* Haines v. Kerner, 404 U.S. 519, 520 (1972)).

interference in the first place." <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968).

In the instant action, Clinton denies that he was speeding and maintains that "[t]he true purpose of stopping [him] was based on [Officer Stinnett's] dislike for [him,] to search his person[,] and harass him."  [Doc. 1 at 9-10].  In the Tenth Circuit, however, a violation need not have actually occurred to make an initial traffic stop justifiable.  To the contrary, "[a]n initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  <u>Hunnicutt</u>, 135 F.3d at 1348; <u>accord</u> <u>Carlsen v. Duron</u>, 229 F.3d 1162, at *3 (10th Cir. 2000) (unpublished opinion) (holding the same, in civil action brought pursuant to 42 U.S.C. §1983).  Moreover, "[i]t is irrelevant that the officer may have had other subjective motives for stopping the vehicle." <u>Id.</u>

The record evidence in this case reveals that Officer Stinnett stopped Clinton for speeding, <i>i.e.</i>, traveling 69 miles per hour in a 40 mile per hour zone.[8] [<u>See</u> Doc. 52; Exh. C]. Through his deposition, Officer Stinnett testified that his patrol unit has a radar detector, which "locked" onto Clinton traveling in excess of the posted speed.  [Doc. 52; Exh. A, Feb. 23, 2006 depo. of Alfred Clyde Stinnett at 28].  Officer Stinnett further testified that he

---

[8]  Officer Stinnett also stopped Clinton for driving recklessly, <i>i.e.</i>, continuing to speed away at 69 miles per hour until stopped.  [<u>See</u> Doc. 52; Exh. C].  Because the Court determines that Officer Stinnett had reasonable suspicion to stop Clinton for speeding, and because the undisputed evidence indicates that Officer Stinnett made the decision to stop Clinton on the basis of Clinton's speeding, <u>see</u> Doc. 52; Exh. A at 33, the Court does not address the issue of Clinton's alleged reckless driving.

confirmed the accuracy of his radar equipment by "pacing" Clinton for approximately one mile.[9]  [Id. at 35].  On the basis of the electronic readings and his own observations, Officer Stinnett decided to stop Clinton for the misdemeanor traffic offense of speeding.  See NMSA 1978 § 66-8-7(A).  A stop and detention for speeding are supported by reasonable suspicion to believe that a violation has occurred where both personal observations and radar readings confirm that such a violation has taken place.  See United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993).  For these reasons, the Court concludes that Officer Stinnett's initial traffic stop was lawful.[10]  Because no Fourth Amendment violation resulted from the initial traffic stop, Officer Stinnett is entitled to qualified immunity for his actions insofar as they relate to the stop.  See Saucier, 533 U.S. at 201.

---

[9]  When asked whether he had approximated Clinton's speed on the basis of his training and experience of his electronic equipment, Officer Stinnett responded as follows: "*I had the electronic equipment but also I could back that up . . . with the pacing because if we're staying an equidistant apart from each other and that's not changing, I have correctly paced for whatever mile or mile and a half or whatever distance it may have been*."  [Doc. 52; Exh. A; Stinnett depo. at 35].

[10]  Clinton denies that he was speeding and directs the Court to Hall v. Bellmon, 935 F.2d 1106 (10th Cir. 1991) for the proposition that, because a material question of fact exists on this issue, it cannot be resolved at the summary-judgment stage.  [Doc. 53 at 9].  While  it is true that the Tenth Circuit in Hall held that material factual disputes cannot be resolved at the summary-judgment stage based on conflicting affidavits where the nonmovant's affidavit is based upon personal knowledge and sets forth facts that would be admissible in evidence, it also made clear that conclusory and self-serving affidavits are not sufficient to defeat a motion for summary judgment.  See Hall, 935 F.2d at 1111.  In this case, in opposition to evidence that he was traveling 69 miles per hour in a 40 mile per hour zone, Clinton has offered nothing but a denial that he was speeding and the conclusory allegation, offered during his deposition, that he did nothing wrong.  [See Doc. 52; Exh. B, Dec. 19, 2005 depo. testimony of Clinton Garrison at 65; see also Doc. 53 at 1, 11].  While the Court is cognizant of the fact that Clinton did not have an attorney when he gave his deposition and was represented by his father, Steve, Clinton nevertheless was represented by counsel at the time a response to Defendants' summary-judgment motion was filed on his behalf.

### b. The arrest

The Court similarly concludes that Officer Stinnett is entitled to qualified immunity with respect to his decision to arrest Clinton for failure to sign the citations.  After Officer Stinnett wrote the two citations for speeding and driving recklessly, he presented them to Clinton for his signature.  Clinton did not sign the citations immediately upon their presentment but, rather, asked if he could wait until his parents, whom he knew had been called, arrived.  Officer Stinnett warned Clinton that if he did not sign the tickets, he could be arrested.  [Doc. 54; Exh. B, Clinton Garrison depo. at 41].  Clinton appears to allege that Officer Stinnett then arrested him without probable cause to do so.  [See Doc. 1 at 11; Doc. 53 at 10].

A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause.  Olsen, 312 F.3d at 1312 (quoting Tenn. v. Garner, 471 U.S. 1, 7 (1985)). In the context of a warrantless arrest in a § 1983 action, the arresting officer must be granted qualified immunity "if a reasonable officer could have believed that probable cause existed to arrest the plaintiff." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir.1995).  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Olsen, 312 F.3d at 1312 (internal quotation omitted).  Indeed, the primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the

"information possessed by the [arresting] offic[er]."  Romero, 45 F.3d at 1476 Id. (*quoting*

Anderson v. Creighton, 483 U.S. 635, 643 (1987)).

Pursuant to NMSA 1978 § 66-8-123,

> whenever a person is arrested for any violation of the Motor
> Vehicle Code or other law relating to motor vehicles punishable
> as a misdemeanor, the arresting officer, using the uniform traffic
> citation, *shall* complete the information section and prepare a
> notice to appear in court, specifying the time and place to
> appear, *have the arrested person sign the agreement to appear*
> *as specified*, give a copy of the citation to the arrested person
> and release him from custody.

NMSA 1978 § 66-8-123(A) (emphasis added).  Section 66-8-123 goes on to provide that "in

order to secure his release, the arrested person must give his written promise to appear in

court or to pay the penalty assessment prescribed or acknowledge receipt of a warning

notice."  NMSA 1978 § 66-8-123(D).[11]  In this case, Officer Stinnett presented two citations

to Clinton for signature, but Clinton failed to sign them.  While Clinton has stated that he

simply wanted to wait for his parents to arrive before signing, the record evidence reflects

that Clinton did not sign the citations.  [See Doc. 52; Exh. C, unsigned citations 1021938 and

1021939].  Failure to sign gave Officer Stinnett cause for arrest.  See NMSA 1978 § 66-8-

122(F) ("Whenever any person is arrested for any violation of the Motor Vehicle Code . . .

---

[11]  In United States v. Gonzalez, the Tenth Circuit explained that although the New
Mexico statutes use the word "arrest" to describe the events that occur when a police officer
issues a speeding ticket to a violator, "when a New Mexico police officer stops a car merely to
issue a traffic summons for a minor speeding infraction, we think that for Fourth Amendment
purposes that stop is more in the nature of an investigative detention than a traditional arrest."
United States v. Gonzalez,763 F.2d 1127, 1130 n.1 (10th Cir. 1985).

he shall be immediately taken before an available magistrate who has jurisdiction of the offense when the . . . person refuses to give his written promise to appear in court or acknowledge receipt of a warning notice . . . .").  Moreover, Clinton's reason for not signing immediately does not justify his failure to sign.  See Marshall v. Columbia Lea Regional Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003) ("Neither belief in innocence nor apprehensions regarding the police justify failure to obey a lawful order.").  While Officer Stinnett acknowledges that he could have awaited the arrival of Clinton's parents,[12] Clinton has not demonstrated that Officer Stinnett's decision not to wait, and instead to place Clinton under arrest, rises to the level of a constitutional violation.  To overcome Officer Stinnett's invocation of the doctrine of qualified immunity, Clinton bears the burden of demonstrating the existence of a Supreme Court or Tenth Circuit decision on point, or that the clearly established weight of authority from other courts is as he maintains.  See Farmer, 288 F.3d at 1259.  Clinton has failed to satisfy this burden; if anything, controlling law is contrary to

---

[12]  At Officer Stinnett's deposition, the following exchange took place:

> Q. All right. If he had asked for the opportunity to speak with his parents before he signed the ticket, why was that a problem, if they were on their way?

> A. I don't know if that would actually be a problem or not but it would um—there may not have been a problem with that. I don't think that I would have a huge issue with, you know, wanting to speak to them. At the same time it was, you know he—I don't know.

[Doc. 54; Exh. A; Stinnett depo. at 24].

Clinton's position.  See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (where driver was stopped for misdemeanor seatbelt violation, holding that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); see also Tanberg v. Sholtis, 401 F.3d 1151, 1157 (10th Cir. 2005) (in case involving arrest for, among other things, violation of municipal ordinance setting operating hours for public parks, noting that New Mexico law authorizes a police officer to make warrantless misdemeanor arrest if he has probable cause to believe offense occurred in his presence).  Accordingly, the Court determines that Officer Stinnett is entitled to qualified immunity with respect to his actions in arresting Clinton for failure to sign the two citations upon presentment.

### c. The claim of excessive force

At some point after Officer Stinnett stopped Clinton but before Clinton was placed under arrest, Officer Condon arrived on the scene.  [See Doc. 54; Exh. A, Stinnett depo. at 37; Exh. B, Clinton Garrison depo. at 37-40].  Officer Condon thus was present when Officer Stinnett placed Clinton under arrest, which Clinton contends was done through the use of excessive force.  Officers Stinnett and Condon now assert that they are entitled to qualified immunity on the issue of the use of excessive force.  The Court disagrees.

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.  "The degree of physical coercion that law enforcement officers may use is not

15

unlimited, however, and 'all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.'" Cortez, 438 F.3d at 993 (*quoting* Graham, 490 U.S. at 395).  In making the reasonableness determination, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Phillips v. James, 422 F.3d 1075, 1080 (10th Cir. 2005) (*quoting* Graham, 490 U.S. at 396).  While there is no precise formula to apply, relevant factors to consider include (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.  Id. (internal quotation omitted).

In this case, Clinton maintains that, in effecting the arrest for refusal to sign the citations, Officer Stinnett grabbed him, twisted his arm behind his back, and slammed his head onto the hood of his patrol unit.  Clinton's father Steve, who witnessed the arrest, described Officer Stinnett as having grabbed Clinton by the arm and slamming Clinton into the hood of his patrol unit before "jerk[ing] him back up and put[ting] . . . handcuffs on him." [Doc. 54; Exh. C, Steve Garrison depo. at 55].  Officer Stinnett contends that his actions in effecting the arrest were reasonable.  However, application of the above three factors to the facts of this case reveals that the crime at issue—the misdemeanor traffic offense of failing to sign  traffic citations, NMSA 1978 § 66-8-122(F)—is not particularly severe.  There also has been no allegation that Clinton, who contends that Officer Stinnett  patted him down and

16

found nothing but a spark plug by the time the arrest was effected, posed an immediate threat to either Officer Stinnett or Officer Condon.  There similarly has been no allegation that Clinton was actively resisting arrest or attempting to evade arrest by flight.  To the contrary, Clinton's father Steve, a witness to the arrest, affirmatively denies that Clinton was resisting. [See Doc. 54; Exh. C, Steve Garrison depo. at 54].  Taking Clinton's allegations as true and viewing the evidence in a light most favorable to Clinton, see Cortez, 438 F.3d at 991, the Court concludes that  material factual issues exist as to whether Officer Stinnett used excessive force  in arresting Clinton.  Consequently, the Court cannot say at this stage of the proceedings that Officer Stinnett is entitled to qualified immunity.

Nor is Officer Condon entitled to qualified immunity with respect to the issue of the use of excessive force.  The Tenth Circuit has held—and Officer Condon has conceded[13]—that a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983.   See Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996).  As does Officer Stinnett, Officer Condon maintains that excessive force was not applied against Clinton.  However, this Court's determination that material factual issues exist as to the reasonableness of Office Stinnett's use of force during Clinton's arrest precludes a finding that Officer Condon is entitled to qualified immunity under the circumstances.

## 2. The Sixth Amendment

---

[13]  See Doc. 52 at 14 ("Officer Condon does have an affirmative duty to intervene in the case of excessive force, and failure to do so violates a clearly established constitutional right.").

Clinton has also asserted (though it is not entirely clear against whom) a claim for violations of his rights under the Sixth Amendment.  This claim appears to stem from the allegations that (1) Clinton's request to speak to his parents (and therefore to receive "parental counsel") before signing the citations was denied; and (2) once at the police station, Clinton was questioned "without council [sic] or parental supervision." [Doc. 1 at 7, 16]. "[The] Sixth Amendment right to counsel attaches when formal judicial proceedings, such as a formal charge, preliminary hearing, indictment, information, or arraignment, have been initiated . . . ." United States v. Toles, 297 F.3d 959, 965 (10th Cir. 2002).  In this case, at neither time at issue had formal judicial proceedings been initiated against Clinton. Accordingly, to the extent that Clinton has asserted a claim for the violation of his Sixth Amendment right to counsel, such a claim does not survive summary judgment.[14]

### D. Claims Against Lieutenant Born, Chief Maddox, and the Municipal Defendants

Although somewhat difficult to discern from the pleadings, Clinton appears next to allege that Chief of Police Lanny Maddox and Lieutenant Wolfgang Born failed to train and supervise Officer Stinnett even though they were fully aware that approximately six months before Clinton was stopped and arrested, Officer Stinnett used unnecessary force to control

---

[14]  Clinton also alleges that while questioned at the police station, he was never advised of his Miranda rights.  [See Doc. 1 at 7].  Assuming without deciding that Clinton was subject to a custodial interrogation without having been Mirandized, the failure to give Miranda warnings does not subject police officers to § 1983 liability.  Bennett v. Passic, 545 F.2d 1260, 1263 (10th Cir. 1976).

Suzanne DiPaolo, another juvenile in his custody ("the DiPaolo incident").[15]  The DiPaolo incident also gives rise to Clinton's claim that the Village of Ruidoso and its Councilmembers tolerated a custom or policy of allowing Officer Stinnett to deprive others of their constitutional rights.

Under § 1983, a defendant may not be held liable under a theory of *respondeat superior*.  Worrell v. Henry, 219 F.3d 1197, 1214 (10th Cir. 2000).  Instead, to establish supervisory liability, a plaintiff must show that "an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Id. (*quoting* Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.1988)).  While neither simple nor gross negligence implies an intentional and deliberative violation of constitutional rights, and consequently neither form of negligence satisfies the scienter requirement of § 1983, recklessness does include an element of deliberateness—a conscious acceptance of a known serious risk. Recklessness therefore is generally regarded as satisfying the scienter requirement of § 1983 because it requires proof that the supervisor focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in that risk.  Johnson v. Martin, 195 F.3d 1208, 1219 (10th Cir. 1999).

In this case, Officer Stinnett was investigated, evaluated, and disciplined following the DiPaolo incident.  The record evidence reveals that within five days of the incident,

---

[15]  See Doc. 53 at 18-19 ("Maddox and Born had reviewed the tape [of the DiPaolo incident] . . . and not only decided to return Stinnett and refuse his resignation, they allowed him to continue to work with no restrictions until public [pressure] forced his resignation.").

Lieutenant Born had conducted an internal affairs investigation into Officer Stinnett's actions. [Doc. 52; Exh. E]. As part of the investigation, Officer Stinnett was made to view (apparently more than once) a videotape of the DiPaolo incident in Lieutenant Born's presence and to explain his actions. [Doc. 52; Exh. G]. Lieutenant Born then recommended to Chief Maddox that Officer Stinnett undergo a psychological examination to determine his fitness for duty and receive a three-day suspension without pay. [Doc. 52; Exh. E]. Within approximately six months of the DiPaolo incident, Officer Stinnett had undergone the psychological examination and was assessed for fitness for duty, temperament, and anger management skills. The examining psychologist determined that, while Officer Stinnett had overreacted during the DiPaolo incident, he had not acted maliciously or intentionally. Officer Stinnett was given two days' administrative leave without pay. [Doc. 52; Exh. G]. Lieutenant Born, who explained that the Village of Ruidoso Police Department had a training program with which Officer Stinnett was in compliance at all relevant times, expressed his belief that the DiPaolo incident was an isolated incident. [See id.; see also Doc. 52; Exh. H, May 5, 2006 affidavit of Wolfgang Born].

In light of the foregoing, the Court cannot say that either Lieutenant Born or Chief Maddox deliberately assumed or acquiesced in the risk of any unconstitutional conduct. To the contrary, after the DiPaolo incident occurred, Lieutenant Born immediately conducted an internal investigation of Officer Stinnett's actions and had a psychological evaluation completed. Officer Stinnett also was disciplined by being placed on administrative leave without pay. Clinton's allegation that Lieutenant Born and Chief Maddox allowed Officer

Stinnett "to continue to work with no restrictions" is simply not supported by the evidence in the record.  [See Doc. 53 at 18].  Accordingly, the Court concludes that the supervisory liability claim against Wolfgang Born and Lanny Maddox does not survive summary judgment.

As stated, the DiPaolo incident also gives rise to Clinton's claim that the Village of Ruidoso and its Village Councilmembers ("the municipal Defendants") tolerated a custom or policy of allowing Officer Stinnett to deprive others of their constitutional rights.  While municipalities can be sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights,  a municipality will not be held liable for the actions of its employees under a theory of *respondeat superior*.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-691 (1978). Instead, a plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or "custom" causing the complained-of injury. Marshall, 345 F.3d at 1177.  An unconstitutional deprivation is caused by a municipal "policy" if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself.   "Custom" has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law.  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403, 404 (1997).

In this case, Clinton has failed to demonstrate that the municipal Defendants had a policy or custom of allowing Officer Stinnett to violate the constitutional rights of others. Because Clinton is attempting to prove the existence of a policy or custom on the basis of

a single previous incident, the DiPaolo incident, he must show that "the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996). This is because "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-824 (1985). Moreover, "[t]o infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in Monell." Id. at 831 (Brennan, J., concurring).

As an initial matter, the Court notes that there is no allegation—much less evidence—that Officer Stinnett was authorized to make decisions on behalf of the Village of Ruidoso. See Jenkins, 81 F.3d at 994. Additionally, as the Ninth Circuit has explained, there can be no municipal liability absent evidence that the use of excessive force was a formal policy or widespread practice or that previous constitutional violations had occurred for which offending officers were not discharged or reprimanded. Nadell v. Las Vegas Metro. Police Dep't, 268 F.3d 924, 930 (9th Cir. 2001). Clinton's failure to present evidence of other acts by police officers to prove that the use of excessive force is a widespread practice or custom in the Village of Ruidoso Police Department prevents the inference that the use of excessive force is sufficiently pervasive to rise to the level of a custom. See id.

Nor has Clinton demonstrated that Officer Stinnett was not disciplined for his actions during the DiPaolo incident.  To the contrary, the record evidence shows that, as a consequence of his conduct during the DiPaolo incident, Officer Stinnett was immediately investigated, made to undergo a psychological evaluation, and placed on administrative leave without pay.  In light of the foregoing, the Court concludes that summary judgment must be entered in favor of the municipal Defendants.

**III. CONCLUSION**

For the foregoing reasons, Defendants' summary-judgment motion will be granted in part and denied in part.

**IT IS, THEREFORE, ORDERED** that *Defendants' Third Motion for Summary Judgment* [Doc. 51] is **GRANTED IN PART** and **DENIED IN PART;**

**IT IS FURTHER ORDERED** that *Defendants' Third Motion for Summary Judgment* is **GRANTED** with respect to Plaintiff Clinton Garrison's allegation that Defendant Alfred Clyde Stinnett effected a traffic stop in violation of Garrison's Fourth Amendment rights;

**IT IS FURTHER ORDERED** that *Defendants' Third Motion for Summary Judgment* is **GRANTED** with respect to Plaintiff Clinton Garrison's allegation that Defendant Alfred Clyde Stinnett effected an arrest in violation of Garrison's Fourth Amendment rights;

**IT IS FURTHER ORDERED** that *Defendants' Third Motion for Summary Judgment* is **DENIED** with respect to Plaintiff Clinton Garrison's allegation that Defendants Alfred Clyde Stinnett and Corky Condon violated Garrison's Fourth Amendment right to be free from the use of excessive force;

**IT IS FURTHER ORDERED** that *Defendants' Third Motion for Summary Judgment* is **GRANTED** with respect to Plaintiff Clinton Garrison's allegation that he was deprived of his Sixth Amendment right to counsel;

**IT IS FURTHER ORDERED** that *Defendants' Third Motion for Summary Judgment* is **GRANTED** with respect to Plaintiff Clinton Garrison's allegations against Defendants Wolfgang Born and Lanny Maddox;

**IT IS FURTHER ORDERED** that *Defendants' Third Motion for Summary Judgment* is **GRANTED** with respect to Plaintiff Clinton Garrison's allegation that the Village of Ruidoso and Village Councilmembers Ronald Hardeman, Frank T. Cummins, Lonnie Ray Nunley, Robert Sterchi, Deborah Marcum-Byars, and Ron Anderson are liable for the creation of a custom or policy that caused a deprivation of Garrison's constitutional rights.

**SO ORDERED** this 2nd  day of  August, 2006, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge